UNITED STATES DISTRICT CIOURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EISSA JABER,                                    Case No. 18-11166

      Plaintiff                              District Judge Paul D. Borman

v.                                              Magistrate Judge R. Steven Whalen

COMMISSIONER OF
SOCIAL SECURITY,

      Defendant.

_____ /

**REPORT AND RECOMMENDATION**

Plaintiff Eissa Jaber ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner ("Defendant") in denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. The parties have filed cross-motions for summary judgement which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment [Docket #16] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #13] be DENIED.

## I.   PROCEDURAL HISTORY

On May 12, 2014, Plaintiff filed an application for DIB, alleging disability as of January 3, 2013[1] (Tr. 200).  Upon initial denial of the claim, Plaintiff requested an administrative hearing, held on February 15, 2017 in Detroit, Michigan (Tr. 30). Administrative Law Judge ("ALJ") Therese Tobin presided.  Plaintiff, represented by attorney Ebonie Adams, testified (Tr. 36-62), as did Vocational Expert ("VE") Stephanie Leech (Tr. 62-68).  On August 10, 2017, ALJ Tobin determined that Plaintiff was not disabled (Tr. 11-24).  On March 30, 2018, the Appeals Council denied review of the administrative decision (Tr. 1-3).  Plaintiff filed suit in this Court on April 12, 2018.

## II.   BACKGROUND FACTS

Plaintiff, born October 26, 1984, was 32 at the time of the  administrative decision (Tr. 24, 200).  He completed two years of college and worked previously as a deck hand, electrician, and line worker (Tr. 251).  He alleges disability due to depression, loss of memory, a brain injury due to carbon monoxide poisoning, and problems of the neck, back, and femur (Tr. 250).

### A.  Plaintiff's Testimony

Plaintiff offered the following testimony.

His former work included a job on a ship placing heavy items on a conveyor belt and making mechanical repairs to the belt when required (Tr. 37-39).  The job also involved deck work and helping the captain (Tr. 40-42).

---

[1]    Plaintiff later amended the alleged onset of disability date to January 1, 2014 (Tr. 11).

Since sustaining injuries in a fall, Plaintiff was unable to work due to medication side effects, mood swings, and "motion issues" (Tr. 47).  He believed that his medications were prescribed "just to destroy" his life (Tr. 47).  He had not applied for work since the alleged onset of disability (Tr. 48).  Plaintiff stated that he was 21, not 32 (Tr. 48).  He and his wife had four children with a fifth "on the way" (Tr. 49).  He held a driver's license but did not drive when he was taking medication (Tr. 49).  He lived in a one-story house (Tr. 50).  He was able to care for his personal needs but his wife was responsible for taking care of the children (Tr. 51).  He denied smoking, drinking, and the use of illicit substances (Tr. 52).  His pain medication effectively quelled his pain but created the side effects of weakness, constipation, and daily headaches (Tr. 53).  His wife organized his medication (Tr. 53).  He did not use a cane or walker but used a back brace occasionally (Tr. 54).  No surgeries had been planned (Tr. 54).  He was able to stand for up to 30 minutes at a time and did not experience trouble sitting (Tr. 55).  He was able to lift his three younger children (Tr. 55).  He was able to help his wife with indoor and outdoor cleaning projects (Tr. 55).  He did not experience problems bending (Tr. 55).  Recovering from a squat caused dizziness (Tr. 56).  He did not experience problems reaching or other manipulative activity (Tr. 56).  At the time of the hearing, the State of Michigan had discontinued his disability benefits (Tr. 57).

In response to questioning by his attorney, Plaintiff reported that he stayed up for up to three days at a time (Tr. 57).  He was sometimes afraid to go to sleep (Tr. 58).  He took medication for sleeping, anxiety, stress, depression, asthma, and back pain (Tr. 59).  He required the daily use of an inhaler since experiencing carbon monoxide poisoning

(Tr. 62).  He enjoyed doing things with his family including school outings, going to the park, and shopping (Tr. 62).

*Plaintiff's counsel noted that Plaintiff was being treated for depression, anxiety, carbon monoxide poisoning, asthma, and back pain* (Tr. 61).

**B. Medical Records**

**1. Records Related to Plaintiff's Treatment**

February, 2013 records by Louis N. Radden, D.O. of Spine Specialists of Michigan P.C. ("Spine Specialists") note that Plaintiff had made a Worker's Compensation claim against his employer due to headaches and back and neck pain since a workplace accident the previous month (Tr. 521, 524, 533).  Plaintiff also reported ringing of the ears (Tr. 524).  He reported an improvement in symptoms with heat therapy (Tr. 534).  A May, 2013 MRI of the right shoulder showed only mild tendinosis (Tr. 590).  An MRI of the left shoulder showed mild lateral arch stenosis and supraspinatus tendinosis (Tr. 597).  An MRI of the cervical spine was wholly normal (Tr. 592).  An MRI of the lumbar spine was negative for signs of injury with mild facet arthrosis and facet capsulitis at L3-L4 and L4-L5 and mild facet arthrosis at L5-S1 (Tr. 594).  In September, 2014, Dr. Radden observed 75 percent of a normal range of lumbar spine motion (Tr. 562).  Dr. Radden noted that Plaintiff was fully oriented with a normal gait but had not reached "pre-accident status or maximum medical improvement" (Tr. 562-563).  November, 2013 treating records note a history of allergies, dizziness, and chest and back pain (Tr. 458).  December, 2013 treating records by Mahmoud Sadie Rahim, M.D. note the conditions of headaches, bronchitis, and dizziness but an otherwise normal examination (Tr. 422).  January, 2014

records note acute exacerbation of bronchitis but no diminished breath sounds (Tr. 456-457).  The same month, Dr. Radden found that Plaintiff was unable to work and required household replacement services until April, 2014 (Tr. 660, 662).  Plaintiff reported back and neck pain (Tr. 396).  He appeared alert and fully oriented (Tr. 406, 453).  March, 2014 records note Plaintiff's report of dizziness and chest, neck, and back pain (Tr. 380).  May, 2014 records note identical complaints (Tr. 347).

Dr. Radden's July, 2014 records note a 20 percent reduction in symptoms after physical therapy (Tr. 550).  Plaintiff reported that he had ceased physical therapy because he was afraid that "people are going to be hurt" but denied thoughts or plans to hurt himself or others (Tr. 550, 639).  He demonstrated full muscle strength and a normal gait (Tr. 550-551).  Plaintiff was advised to continue conservative management (Tr. 551).

The following month, psychiatrist Madhu Mendiratta, M.D. noted that Plaintiff was evaluated in May, 2014 for depression and unusual behavior (Tr. 625).   Dr. Mendiratta noted that Plaintiff had been showing signs of paranoia after passing out in the engine room of a freighter and exhibiting temporarily elevated carboxyhemoglobin levels (Tr. 625, 1258).  Plaintiff reported stress-related conflicts with a supervisor before the incident (Tr. 625).  Plaintiff was unable to do serial sevens but denied auditory or visual hallucinations (Tr. 626).  The same month, Dr. Radden found that Plaintiff was still disabled from work (Tr. 642).   Dr. Mendiratta's November, 2014 records note that Plaintiff exhibited paranoid behavior and appeared untidy (Tr. 1251).  December, 2014 treating records by Raya Hussain, M.D. (consistent with records from July, 2014 forward)

note complaints of headaches, dizziness, and back and neck pain but that Plaintiff appeared fully oriented (Tr. 691-795).

In January, 2015, Dr. Radden noted that Plaintiff was fully oriented and demonstrated full muscle strength in the lower extremities (Tr. 645). The following month, Dr. Radden order a back brace for back pain, muscle spasm, and nerve root compression (Tr. 648, 652). He found that Plaintiff was disabled and required household replacement services through April, 2015 (Tr. 664-674). Dr. Mendiratta's October, 2015 records state that Plaintiff was cooperative with appropriate attire and a normal gait and mood (Tr. 1249). In December, 2015, Dr. Mendiratta opined that Plaintiff was unable to work due to "depression secondary to carbon monoxide poisoning" (Tr. 628). The same month, Dr. Hussain noted a history of depression (Tr. 982). Dr. Hussain's records (consistent with records from January, 2015 forward) note that Plaintiff was fully oriented (Tr. 986-1058). The same month, Plaintiff sought emergency treatment for chest tightness and pain (Tr. 1076). He reported to emergency room personnel that he had traveled to Texas on a 20-hour car trip one week earlier (Tr. 1076). He was discharged in stable condition (Tr. 1078). Dr. Mendiratta's August, 2016 records note that Plaintiff was depressed and "hostile" about not having any income (Tr. 1245). Dr. Mendiratta's October, 2016 records note that Plaintiff was depressed due to financial constraints and worry about his family (Tr. 1239). Dr. Mendiratta's November, 2016 records note that Plaintiff appeared anxious with a labile effect (Tr. 1237).

Dr. Hussein's January, 2017 records (consistent with records from records from January, 2016 forward) note a history of depression and joint pain but that Plaintiff was

fully oriented (Tr. 1103-1193).  Dr. Mendiratta's March, 2017 treating record note that Plaintiff experienced stress and forgetfulness but was dressed appropriately with a normal gait, posture, and thought content (Tr. 1230).

## 2. Non-Treating Records

In October, 2014, Twaide Langham, D.O. performed a non-examining assessment of Plaintiff's physical condition on behalf of the SSA, finding that he could lift 20 pounds occasionally and 10 frequently; sit, stand, or walk for six hours in an eight-hour workday; and push and pull without limitation (Tr. 86-88).  Dr. Langham limited Plaintiff to less than frequent overhead reaching with the left shoulder (Tr. 87).  In November, 2014, psychiatrist Zahra Yousuf, M.D. performed a non-examining review of the treating records on behalf of the SSA, finding that due to schizophrenia and paranoia, Plaintiff was psychologically unable to perform even unskilled work[2] (Tr. 88-89).

In August, 2015, Edward Czarnecki, Ph.D. performed a second non-examining review of Plaintiff's mental limitations, taking into account the results of the CDIU investigation (Tr. 100).  He found that Plaintiff experienced mild limitation in activities of daily living, social functioning, and moderate limitation in concentration, persistence, or

---

[2]

Following Dr. Yousuf's disability assessment, an investigation was conducted by the Cooperative Disability Investigations Unit ("CDIU") of the SSA at which time Plaintiff's neighbor reported that Plaintiff drove his children and attended Mosque daily; brought same neighbor food; mowed the lawn; shoveled snow; did not require the use of an assistive device; and got along with others (Tr. 97).  Plaintiff was seen shopping at Sam's Club using an EBT card without difficulty, loading groceries, and carrying his child (Tr. 97).  Plaintiff did not appear "overwhelmed or anxious" although the store was "busy" and "crowded" at the time (Tr. 97).

pace (Tr. 100).   Dr. Czarnecki, found at most moderate work-related concentrational limitation (Tr. 103-104).

In March, 2017, Julia A. Czarnecki, M.A. performed a consultative mental examination on behalf of the SSA, noting Plaintiff's report of paranoid ideation (Tr. 1264).   Czarnecki noted that "as the interview continued and the mental status and IQ testing were initiated, it became apparent to this examiner that [Plaintiff] was likely greatly exaggerating for secondary gain," noting his claim that he thought that the day after Monday was Thursday and that he was 21 rather than 32 (Tr. 1264).   Plaintiff claimed that he was unable to identify a picture of a plane by name (Tr. 1266).   Czarnecki noted that Plaintiff "appeared to malinger and exaggerate greatly" (Tr. 1279).

### C.  Vocational Testimony

VE Leech classified Plaintiff's past work as a deck hand/electrician as skilled and exertionally heavy (medium as described); assembler, unskilled/medium; and conveyor system operator, semiskilled/medium (very heavy as described)[3] (Tr. 63, 299).

---

[3]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

ALJ Tobin posed a total of four sets of work-related limitations to the VE, each describing an individual of Plaintiff's age, education level, and work history. In the first set, she offered the following limitations:

> [L]ight exertional level with the following limitations. Limited to performing simple routine tasks, use judgment in the workplace limited to simple work-related decisions, deal with changes in the work setting, limited to simple work-related decisions. Frequent contact with coworkers, supervisors and the general public (Tr. 64).

The VE testified that the above limitations would preclude all of Plaintiff's past relevant work but would allow for the light, unskilled work of a bench assembler (60,000 positions in the national economy); packer (250,000); and inspector (120,000) (Tr. 64).

Second, the VE testified that if the above limitations were amended to limit the individual to frequent balancing, stooping and climbing ramps and stairs, along with occasional kneeling, crouching, crawling, exposure to heights and moving mechanical parts, and occasional climbing of ladders, ropes, and scaffolds, the job numbers would be reduced: bench assembler (45,000); packer (80,000); and inspector (60,000) (Tr. 65).

Third, the VE testified that if the amended restrictions also included an "at will" sit/stand option, the job numbers would be further reduced: bench assembler (15,000); packer (25,000); and inspector (30,000) (Tr. 66).

Fourth, the VE testified that if the hypothetical individual lacked the persistence, pace or concentration to perform full-time simple work; were off-task for at least 20 percent of the workday; or, were absent three or more days a month, no competitive employment would be available (Tr. 66). The VE stated that her testimony was

consistent with the information found in the *Dictionary of Occupational Titles* ("*DOT*") except for her testimony regarding "absenteeism, time off tasks, sit/stand option and proximity to others" which was based on her own professional experience (Tr. 66-67).

In response to questioning by Plaintiff's attorney, the VE testified that if the third set of limitations (considered along with the first and second set) posed by the ALJ were amended to preclude "production pace or in tandem" work with others, the bench assembler numbers would be unchanged (15,000) with packer and inspector numbers reduced to 15,000 and 25,000 respectively (Tr. 67). The VE stated that if the same individual were in need of "constant redirection from supervisors," all competitive work would be precluded (Tr. 68).

### D. The ALJ's Determination

Citing the medical transcript, ALJ Tobin found that Plaintiff experienced the severe impairments of "psychosis secondary to carbon monoxide poisoning; symptomatic disc bulge at L4-L5 and L5-S1; lumbar strain/sprain; lumbar facet syndrome; lumbar disc herniation; impingement syndrome of the bilateral upper extremities; rotator cuff tear of the bilateral upper extremities; chronic bronchitis; and headaches" but that none of the impairments or combination of impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 14). The ALJ found that Plaintiff experienced moderate limitation in understanding, remembering, or applying information; interacting with others; and in concentrating, persisting, or maintaining pace but only mild limitation in adapting or managing himself (Tr. 16). The

ALJ determined that Plaintiff had a Residual Functional Capacity ("RFC") for light work

as defined in 20 C.F.R. 416.967(b) with the following additional restrictions:

> The claimant requires a sit/stand option permitting change in position if needed and without disturbing the workplace. The claimant can frequently climb ramps and stairs, and occasionally climb ladders, ropes and scaffolds. The claimant can frequently balance and stoop, and occasionally kneel, crouch and crawl. The claimant can occasionally be exposed to unprotected heights and moving mechanical parts. The claimant must avoid concentrated exposure to dust, fumes, odors, and pulmonary irritants. The claimant can avoid concentrated exposure to extreme cold. The claimant is limited to performing simple routine tasks. The claimant's use of judgment in the workplace is limited to simple, work-related decisions. The claimant's ability to deal with changes in the work setting are limited to simple work-related decisions. The claimant can have frequent contact with the public, coworkers and supervisors. (Tr. 17).

Citing the VE's testimony, the ALJ found that while Plaintiff was unable to perform his

past relevant work, he could perform the light, unskilled work of a bench assembler,

packer, and inspector (Tr. 22-24, 64-66).

The ALJ declined to credit Plaintiff's alleged degree of limitation, citing treating

records from July and October, 2014 showing that the back condition improved

significantly with conservative treatment (Tr. 18). She noted that as of March, 2016,

Plaintiff demonstrated a normal range of motion (Tr. 19). The ALJ observed that

Plaintiff's only emergency room visit was for "chest tightness" following a car trip to

Texas (Tr. 19). She noted that "behavior, judgment, and thought context were normal"

(Tr. 19).

The ALJ assigned "little weight" to Dr. Radden's disability opinion (Tr. 20). She

noted that Dr. Radden failed to identify the physical limitations on a function-by-function

basis (Tr. 20). She discounted the opinion further on the basis that the MRI studies did

not support a finding of disabling physical problems and that Plaintiff's treatment had been exclusively conservative (Tr. 20).

As to the mental impairments, the ALJ assigned "little weight" to Dr. Meddiratta's disability opinion, noting that the treating assessment did not include a function-by-function analysis; Plaintiff's treatment had been conservative; "ongoing exaggerations" regarding by Plaintiff regarding his mental state; and his ability to drive to Texas (Tr. 21). The ALJ cited consultative examiner Czarnecki's finding that Plaintiff "greatly exaggerat[ed]" his degree of mental instability for "secondary gain" (Tr. 20).

### III.    STANDARD OF REVIEW

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, — U.S. —, 139 S.Ct. 1148, 1154 (2019)(punctuation altered)(*citing Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938))(emphasis deleted).  The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  *Biestek* at 139 S. Ct. at1152; 42 U.S.C. §405(g).   "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Commissioner of Social Sec*., 486 F.3d 234, 241 (6th Cir. 2007)(*citing Cutlip v. Sec'y of Health & Human Servs*., 25 F.3d 284, 286 (6th Cir.1994)).

The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the

courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(*en banc*). Where substantial evidence supports the ALJ's decision, the reviewing court "defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Commissioner Of Social Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)(*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)). However, in determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV. FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four,

but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V.  ANALYSIS

Plaintiff makes four arguments for remand, contending first that the ALJ committed reversible error by "failing to provide any legitimate reasons" for the "minimization of" Dr. Mendiratta's disability finding of psychiatric disability. *Plaintiff's Brief,* 6-9, *Docket5 #13,* Pg ID 1336. He argues next that the ALJ failed to provide a rationale for the limitations/residual abilities found in the RFC as required by SSR 96-8p and SSR 85-15p. *Plaintiff's Brief* at 10-12. Third, he argues that he is unable to stand for six hours in an eight-hour workday as required for exertionally light work. *Id.* at 13-14. Finally, he contends that the ALJ failed to "discuss, much less consider" the side effects of the prescribed medication in assessing his ability to work. *Id.* at 15-16.

Plaintiff's second and third arguments both pertain to the RFC composed by the ALJ and will thus be considered in tandem. The first and fourth arguments will considered separately.

### A.  Dr. Mendiratta's December, 2015 "Disability" Opinion (Argument 1)

Plaintiff appears to take issue with the rejection of psychiatrist Dr. Mendiratta's December, 2015 statement that he was disabled due to "depression secondary to carbon monoxide poisoning." *Plaintiff's Brief* at 6; (Tr. 20-21, 982).

Dr. Mendiratta qualifies as a "treating physician." For the period under consideration, the opinion of a treating physician should be given controlling weight if "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and "not inconsistent with the other substantial evidence." *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004) 20 C.F.R. § 404.1527(c)(2)); SSR 96–2p, 1996 WL 374188, at *5 (1996)).[4]

In the instance where the ALJ declines to accord controlling weight to a treating opinion, he or she must provide "good reasons" for discounting the treating opinion. *Gayheart v. Comm'r of Social Security*, 710 F.3d 365, 376 (6th Cir. 2013); *Wilson,* 378 F.3d at 544–546 (6th Cir. 2004);  SSR 96–2p at *5.   The failure to articulate "good reasons" for rejecting a treating physician's opinion constitutes reversible error. "[T]he Commissioner imposes on its decision-makers a clear duty to 'always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's

---

[4]    The administration rescinded SSR 96-2p on March 27, 2017. *See* Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p, 82 FR 15263-01 (Mar. 27, 2017). Under the new rules, ALJs will weigh both treating and non-treating medical evaluations based on how well they are supported by the remainder of the record. 20 C.F.R. §§ 404.1520b; 416.920c. The "new rules, however, apply only to claims filed on or after March 27, 2017." *Hancock v. Commissioner of Social Security*, 2017 WL 2838237, at *8 (W.D. Mich. July 3, 2017)(*citing Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 FR 5844-01 (Jan 18, 2017) ). Because current Plaintiff filed her claim well before March 27, 2017, SSR 96-2p applies.

medical opinion and the reasons for that weight.' " *Gayheart*, at 376  (*citing* SSR 96–2p, at *5).

Contrary to Plaintiff's claim, the ALJ's analysis and rejection of Dr. Meddiratta's December, 2015 opinion is well supported and articulated.  The ALJ acknowledged that Plaintiff received treatment from Dr. Meddiratta from May, 2014 forward (Tr. 20).  She noted that Dr. Meddiratta diagnosed Plaintiff with psychosis secondary to carbon monoxide poisoning and prescribed psychotropic medication (Tr. 20).  The ALJ cited Dr. Meddiratta's treating records noting Plaintiff's reports of paranoia (Tr. 20).

Notwithstanding, the ALJ provided multiple "good reasons" for according "little weight" to Dr. Meddiratta's opinion (Tr. 21).  She noted that mental health treatment was both sporadic and conservative (Tr. 20-21).  She cited treating records showing a normal thought content (Tr. 20-21).  The ALJ's reasoning is consistent with my own review of the record showing that Dr. Meddirata repeatedly observed normal thought content and full orientation (Tr. 1230, 1249).  The ALJ also noted that Dr. Meddiratta's one-sentence disability opinion was unaccompanied by an assessment of Plaintiff's work-related abilities (Tr. 21).  Finally, the ALJ observed that Dr. Meddiratta's disability opinion was undermined by evidence of Plaintiff's "ongoing exaggerations," of his mental and physical problems, and his ability to make a 20-hour car trip to Texas (Tr. 21).

The record contains additional support for the rejection of Dr. Meddiratta's opinion.  The physical treatment records repeatedly note an unremarkable mental state (Tr. 406, 562-563, 691-795, 1103-1193).  A consultative psychological examiner

concluded in March, 2017 that Plaintiff "appeared to malinger and exaggerate greatly" (Tr. 1279). Consistent with this finding, the CDIU determined that Plaintiff interacted appropriately with neighbors; did not appear anxious or overwhelmed in a "busy" and "crowded" store; used a bridge card without difficulty; and was able to drive his children and engage in varied household and outdoor tasks on a regular basis[5] (Tr. 97).

Because the ALJ satisfied the substantive and procedural requirements of the treating physician analysis, a remand on this basis is not warranted.

**B. The RFC Assessment (Arguments 2 and 3)**

In his second and third arguments, Plaintiff contends that the RFC does not reflect his actual degree of psychological or physical limitation. *Plaintiff's Brief* at 10-12, 13-14.

"RFC is what an individual can still do despite his or her limitations." SSR 96-8p, 1996 WL 374184 at *2. (July 2, 1996). "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts" including objective findings, non-medical evidence, and activities of daily living. *Id.* at *7. The analysis must include the alleged psychological and physical limitations. 20 C.F.R. §§ 404.1545, 416.945.

---

[5] Plaintiff also cites Dr. Radden's records pertaining to the spine condition to support Dr. Mendriatta's mental disability opinion, and then segues into a long, independent discussion of Dr. Radden's records. *Plaintiff's Brief* at 8-9. It is unclear whether Plaintiff faults the ALJ's rejection of Dr. Radden's "disability" findings. Notwithstanding, the ALJ provided satisfactory reasons for her rejection of Dr. Radden's multiple opinions: (1) the ultimate determination of disability is reserved to the Commissioner, 20 C.F.R. § 404.1527(d); (2) Dr. Radden failed to identify the work-related limitations on a "function-by-function" basis; and (3) The MRIs showing at most mild abnormalities, coupled with exclusively conservative treatment, undermined his disability opinions (Tr. 20).

In crafting the RFC, the ALJ's findings must include consideration of the exertional activities of "sitting, standing, walking, lifting, carrying, pushing, [and] pulling" as well as the non-exertional physical limitations and how the psychological limitations affect the ability to "understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." SSR 96-8p at *5-6. "'Although a function-by-function analysis is desirable, SSR 96–8p does not require ALJs to produce such a detailed statement in writing.'" *Delgado v.Comm'r Social Security*, 30 Fed.Appx. 542, 547–548, 2002 WL 343402, at *5 (6th Cir. March 4, 2002)(*citing Bencivengo v. v.Comm'r Social Security*, 251 F.3d 153, slip op., 4 (Table)(3rd Cir. December 19, 2000)(punctuation added)). " '[T]he ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record.'" *Id.* (*citing Bencivengo* at slip op. at 5).

Consistent with my findings in Section **A.,** the record overwhelmingly supports the finding that Plaintiff was capable of "simple routine tasks" and "simple, work-related decision" with "frequent contact with the public, coworkers and supervisors" (Tr. 17). The ALJ cited the August, 2015 non-examining assessment of only moderate psychological limitation, noting that Plaintiff was capable of "simple, rote, repetitive tasks" (Tr. 21, 100). The non-examining findings, without more, constitute substantial evidence in support of the mental RFC. However, the ALJ pointed out that her findings

regarding the psychological limitations were also supported by evidence showing that Plaintiff interacted appropriately with neighbors, shopped without assistance, and was able to navigate a crowded and busy store with his children without apparent anxiety or stress (Tr. 20-21, 97).

For identical reasons, Plaintiff's argument that the ALJ did not comply with the requirements of SSR 85-15 does not provide a basis for remand.  SSR 85-15 states in relevant part that "basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." 1985 WL 56857, at *4 (1985).  SSR 85-15 instructs that a "substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base."   The ALJ's lengthy discussion of the treating records and daily activities in support of the RFC satisfies the requirements of SSR 96-8p and SSR 85-15.

Turning to the physical restrictions, the RFC for a reduced range of exertionally light work with a sit/stand at will option is well explained and generously supported by the record.  The ALJ noted that while straight leg raise testing was positive, Plaintiff demonstrated full strength in all extremities and a normal gait and station (Tr. 18).  She cited the May, 2013 MRI studies, noting that the MRI of the cervical spine was wholly normal and that while the MRI of the lumbar spine showed some level of abnormality, Plaintiff's condition improved with treatment (Tr. 18, 592, 594).   Likewise, the imaging

studies of the shoulders showing only mild abnormalities are adequately addressed by the RFC's limitation to lifting 20 pounds occasionally and 10 frequently (Tr. 17-18). Plaintiff's claim that he is unable to perform work consistent with the RFC due to back, shoulder, and knee problems is grossly undermined by evidence that he was able to shovel snow, mow the lawn, lift groceries, and did not require the use of an assistive device (Tr. 21-22, 97)

In summary, Plaintiff has not met his burden to show that the RFC overstated his psychological or physical capabilities. *See Jordan v. Commissioner of Social Sec.*, 548 F.3d 417, 423 (6th Cir. 2008)("claimant . . . retains the burden of proving her lack of residual functional capacity").

### C. Medication Side Effects (Argument 4)

In his final argument, Plaintiff contends that the ALJ failed "to even discuss, much less consider," the impact of medication side effects on his ability to work.[6] *Plaintiff's Brief* at 15-16.

SSR 16–3p sets forth the standard for evaluating the alleged limitations using a two-step process. 2016 WL 1119029, at *3 (Mar. 16, 2016). First, the ALJ determines whether the claimant has a medically-determinable impairment that could reasonably be expected to produce the alleged pain or limitation. *Id.* at *3. Here, ALJ Tobin

---

[6]     While Plaintiff cites SSR 96-7p in support of his argument that the ALJ failed to consider the medication side effects, the Ruling was rescinded and replaced by SSR 16-3p as of March 28, 2016. 1996 WL 374186 (July 2, 1996); 2017 WL 5180304 (October 25, 2017).

acknowledged that the physical and mental limitations caused some degree of work-related limitation (Tr. 14).

Second, the ALJ must evaluate claims of limitation not reflected in the objective evidence. *Id.* at *3-4. The ALJ must consider "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *4.[7] In other words, whether the record as a whole reflects the claimant's professed degree of limitation.

Plaintiff's claim that the ALJ failed to discuss or consider his claim of medication side effects is flatly contradicted by the record. Citing Plaintiff's hearing testimony, the ALJ acknowledged his claim of the side effects of "weakness, constipation, and headaches"[8] (Tr. 18, 53). Moreover, the ALJ's rationale for discounting Plaintiff's claim

---

[7]

    In addition to an analysis of the medical evidence, 20 C.F.R. §§ 404.1529(c)(3), 416.929 list the factors to be considered in making a credibility determination:

> (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms ... and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms. ]

[8]    While Plaintiff argues that he stated that he experienced the side effect of paranoia from medication, in fact, he testified that he experienced paranoia when he did *not* take the medication (Tr. 52).

of limitation from either medication side effects or his psychological and physical conditions is amply supported by the record. She noted that Plaintiff's ability to drive his children on a daily basis, shop, and perform outdoor chores, along with evidence that he exaggerated his mental impairments for secondary gain, undermined his claims that the medication side effects prevented him from performing unskilled work (Tr. 20-21). The ALJ's analysis of the subjective claims is strongly supported the record as a whole and thus entitled to "great weight." *Cruse v. Commissioner of Social Security*, 502 F.3d 532, 542 (6th Cir. 2007)(*citing Walters v. Commission of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997)).

Because the determination that Plaintiff was not disabled is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## VI.   CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #16] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #13] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec. of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir.

1981).   Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.   *Willis v. Sec. of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.   The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.   The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Date: June 28, 2019

## CERTIFICATE OF SERVICE

I hereby certify on June 28, 2019 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically.  I hereby certify that a copy of this paper was mailed to non-registered ECF participants on June 28, 2019.

s/Carolyn M. Ciesla
Case Manager for the
Honorable R. Steven Whalen